CHURCH E. GATES & CO., Inc., v. NATIONAL FAIR & EXPOSITION ASS'N et al.

(Supreme Court, Appellate Division, Second Department. May 5, 1916.)

1. MECHANICS' LIENS ⬤⟿73(7)—IMPROVEMENT BY LESSEE—CONSENT OF OWNER.
   Under a lease obligating the tenant to spend a fixed sum for improvements subject to owner's approval, a consent to improvements with the understanding that tenant's temporary bond should be replaced by permanent one, not revoked when permanent bond was not furnished, the temporary bond being retained, was sufficient to bind the owner, as the consent given was subject merely to a condition subsequent, and continued until disclaimed.
   [Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 101; Dec. Dig. ⬤⟿73(7).]

2. MECHANICS' LIENS ⬤⟿271(1)—FORECLOSURE—COMPLAINT.
   A complaint foreclosing a mechanic's lien, averring "that no other action or proceeding at law or in equity has been brought to foreclose the said plaintiff's said lien or claim or to recover the amount due to plaintiff," is sufficient, under Code Civ. Proc. § 1629, as to foreclosure.
   [Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 494; Dec. Dig. ⬤⟿271(1).]

3. APPEAL AND ERROR ⬤⟿195—OBJECTIONS AT TRIAL—NECESSITY—AMENDMENT.
   An amendment to a pleading granted without objection is not reviewable.
   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1149; Dec. Dig. ⬤⟿195; Pleading, Cent. Dig. §§ 1408, 1409.]

4. MECHANICS' LIENS ⬤⟿137(2)—NOTICES OF LIEN—MISNOMER.
   A notice of lien, naming the owner as Empire City Trotting Club, which was the former corporate title of the true owner, Empire City Racing Association, where the record title to part of the premises stood in name of the trotting club, is not defective, as containing a misleading misnomer, under Lien Law (Consol. Laws, c. 33) art. 2, § 9, subd. 7, declaring that such a misdescription shall not affect the validity of a lien.
   [Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 227, 229; Dec. Dig. ⬤⟿137(2).]

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

**5.** MECHANICS' LIENS ⬤⟿140—NOTICE OF LIEN—CONSENT OF OWNER.

Notices of mechanic's lien need not state the consent or request of the owner.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 237, 238; Dec. Dig. ⬤⟿140.]

**6.** MECHANICS' LIENS ⬤⟿154(4)—NOTICE—VERIFICATION.

Verification of notices of mechanic's lien by attorney in form of verification of a pleading that the matters alleged are true, except as to the matters alleged on information and belief is sufficient.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 264; Dec. Dig. ⬤⟿154(4).]

**7.** MECHANICS' LIENS ⬤⟿75(1)—CONSENT OF OWNER—FAILURE TO DISAPPROVE.

Labor and material not disapproved by the owner after having been expressly brought to his attention, are regarded as consented to.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 103, 104; Dec. Dig. ⬤⟿75(1).]

**8.** MECHANICS' LIENS ⬤⟿139(3)—NOTICE OF LIEN—COMBINING ITEMS.

A notice of lien, not separating labor and materials furnished from labor and materials to be furnished, is defective.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 236; Dec. Dig. ⬤⟿139(3).]

**9.** MECHANICS' LIENS ⬤⟿139(3)—NOTICE OF LIEN—COMBINING CLAIMS—LABOR AND MATERIAL.

A notice of lien may combine both labor and material in one item.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 236; Dec. Dig. ⬤⟿139(3).]

**10.** MECHANICS' LIENS ⬤⟿209—WAIVER—PARTICIPATING IN BANKRUPTCY PROCEEDINGS AGAINST LESSEE.

Lienors, by voting in bankruptcy creditors' meetings in the matter of bankruptcy of lessee, who made the improvements, do not waive their lien against the property of the lessor.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 383; Dec. Dig. ⬤⟿209.]

**11.** BANKRUPTCY ⬤⟿151—TRUSTEE—TITLE—LIENS ON BANKRUPT'S PROPERTY.

A trustee in bankruptcy takes title subject to all mechanics' liens and proceedings pending to enforce them.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 193, 239; Dec. Dig. ⬤⟿151.]

**12.** BANKRUPTCY ⬤⟿192—MECHANICS' LIENS—NOTICE OF LIEN AFTER BANKRUPTCY.

A notice of lien is not ineffective because filed after adjudication in bankruptcy of the debtor.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 294; Dec. Dig. ⬤⟿192.]

**13.** MECHANICS' LIENS ⬤⟿291(1)—ENFORCEMENT—JUDGMENT—CONDITIONS.

· Where the debtor had given several lienors worthless checks in pretended payment, he is entitled to have appended at the foot of the decree a provision for the production and deposit of such pay checks as are outstanding, not tendered at the trial.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 599; Dec. Dig. ⬤⟿291(1).]

Rich, J., dissenting.

Appeal from Special Term, Westchester County.

Action to foreclose mechanic's lien by Church E. Gates & Co., Incorporated, against the National Fair & Exposition Association and

others. From a judgment for plaintiff and certain defendants, certain other defendants appeal. Affirmed.

Argued before THOMAS, CARR, STAPLETON, RICH, and PUTNAM, JJ.

Leo Oppenheimer, of New York City, for appellants Gue and National Fair & Exposition Ass'n, Inc.

Joshua M. Fiero, of New York City (Joshua M. Fiero, Jr., of New York City, on the brief), for appellant Empire City Racing Ass'n.

George H. Taylor, Jr., of New York City for respondents Church E. Gates & Co., Inc., Wright-Ogden Co., Inc., and Jandous Electric Equipment Co.

Milo J. White, of Mt. Vernon, for respondent Yonkers Lumber Co.

Stephen Holden, of Pleasantville (James H. Cavanaugh, of Mt. Vernon, on the brief), for respondents Jacob Norden, Mt. Vernon Builders' Supply Co., and Kapp & Nordholm Co.

Nathan S. Zucker, of New York City, for respondent Bloom.

Francis M. Applegate, of New York City, for respondent Colwell Lead Co.

William J. Wallin, of Yonkers, for respondents Woodfaulk and others.

PUTNAM, J. The National Fair & Exposition Association (called herein the "tenant"), by instrument dated December 28, 1912, obtained a tentative option for a lease from the Empire City Racing Association (called herein the "owner") of the Empire City Park in Yonkers for five years, from January 1, 1913, with the further right of a five years' renewal. The tenant closed this tentative option on February 28, 1913, by a formal confirmation. Soon afterwards the tenant went into possession, and so continued until the following September, when it was adjudged bankrupt, and its possession passed to the trustee in bankruptcy. This litigation arises over liens for labor and materials incurred during this occupation. The learned justice at Special Term found that the owner had consented also that the labor and materials were furnished with its knowledge and consent. This lease contemplated holding annual fairs and exhibitions on the Park grounds, also that the tenant should make improvements. It provided:

"Second party [the lessee] has the right to change the location of, alter, rearrange or remodel any building, fences, walks, roads or track, now on the grounds, provided the consent of the first party [Empire City Racing Association] is first obtained in writing. And the second party has the right to erect new buildings on such locations as are approved by the first party, or to allow the privilege of erecting buildings to others; such new buildings as may be erected by the second party are to remain their property and may be removed from the premises by them at the termination of this contract, provided that all the agreements herein contained have been faithfully performed by them."

Furthermore, the tenant's obligation for a certain amount of improvements was mandatory:

"It is agreed and understood that second party is to spend, or cause to be spent the sum of twenty thousand dollars ($20,000) on buildings and improvements within two (2) years, and a total sum of fifty thousand dollars ($50,000) within four (4) years."

After taking possession, about April 1, 1913, the tenant planned many extensive alterations, by a scheme involving much new building, such as additions to the rear of the grand stand, transforming the old betting shed into a machinery building, with enlargements of the barns so as to house exhibition animals. These proposed improvements were described with much detail in a letter of July 9, 1913, to the owner wherein the owner's written consent was asked. At this time some of the proposed work had already started. The owner answered on same date, reminding the tenant that by the lease such changes were to be at the tenant's expense and holding the owner harmless. The owner's consent was thus phrased:

"Subject to your furnishing us with a satisfactory guaranty of your ability to pay for such changes and additions, and provided the work is completed before August 31, 1913, we will accord you the following consents under the terms of said lease, to take effect when such guaranty is furnished."

These consents were specified with much detail. Some of the tenant's proposed changes were disapproved, and the owner withheld any consents thereto. There was evidence of a telephone interview as to furnishing a bond by individuals before obtaining the bond of the National Surety Company. On the next day, July 10th, a bond, by Messrs. Stokes and Lea as sureties, was executed, with the condition:

"Whereas, pursuant to the provisions of said lease, the principal has requested the obligee to consent to certain changes and additions to the buildings and grounds of said Empire City Park, and the obligee requires the principal to furnish a guaranty that the expense of such changes and additions will be paid for by the principal and that the obligee will be held harmless therefrom, and which changes and additions and consent are fully set forth in the letter of the principal addressed to the obligee dated July 9, 1913, and the letter of the obligee to the principal dated the same day, both made part hereof: Now, therefore, the condition of this obligation is such, that if the said principal shall faithfully perform and pay for the work necessary to make such changes and additions on its part according to the terms and conditions of said letters, then this obligation shall be void; otherwise to remain in full force and effect."

On July 11th the owner wrote in acceptance:

"We beg to acknowledge receipt of your temporary bond, and to say that, with the understanding that you will supplement it by July 22, 1913, with one issued by the National Surety Company of New York City for $20,000, the same is acceptable to us."

The expected bond by the National Surety Company was never provided. The main question on this appeal is whether, in view of the omission to furnish the bond of the National Surety Company, the owner's consent can be established.

[1] Clearly the owner's acceptance of the personal bond of Stokes and Lea, which it called a "temporary" bond, was a consent to the improvements then going forward, which consent was to last at least for the 10 days until July 22, 1913, which was the purpose of such temporary bond. If the word "understanding," in the owner's letter of acceptance, be given the full force of a "condition," such condition was a condition subsequent, by which the consent was liable to be defeated or withdrawn if the surety company bond should not be given. However, then the owner was required to take some step to withdraw

158 N.Y.S.—68

its consent, which would not cease ipso facto on July 22d, if the promised bond should not be forthcoming. But this the owner did not do. It continued to hold the temporary bond, with the effect that the sureties thereon were liable for work done after, as well as before, July 22d. On July 23d the owner wrote to the tenant's manager, reminding him that the promised bond remained to be furnished. In face of this breach, the owner was not revoking its consent, but rather was still relying on the tenant's fulfillment of his promise. Hence the consent remained, and continued until the owner took some step that would show a purpose to forfeit and withdraw its previous consent to these improvements. Especially is this true when the owner keeps the temporary bond, without any disclaimer of its right to enforce it as security. In considering the owner's purpose at this time, we must bear in mind that these improvements were to the owner's advantage. The tenants could remove such new structures at the termination of the contract, "provided that all the agreements herein contained have been faithfully performed by them." These improvements thus became a security for the rent, and for performance of the tenant's other covenants. Hence the owner's consent continued after July 23d. As to materialmen and laborers, the owner, after thus consenting, could not hold an ambiguous relation to the improvements and additions to its property and increasing its security. McNulty Brothers v. Offerman, 152 App. Div. 181, 137 N. Y. Supp. 27; Hilton & Dodge Lumber Co. v. Murray, 47 App. Div. 289, 62 N. Y. Supp. 35; National Wall Paper Co. v. Sire, 163 N. Y. 122, 57 N. E. 293; Cowen v. Paddock, 137 N. Y. 188, 33 N. E. 154; Tinsley v. Smith, 115 App. Div. 708, 101 N. Y. Supp. 382, affirmed 194 N. Y. 581, 88 N. E. 1133. We therefore agree with the finding that the owner consented to these liens.

[2, 3] Appellant Empire City Racing Association objects to the sufficiency of the complaint foreclosing the lien of Church E. Gates & Company, Incorporated, because it did not comply with section 1629 of the Code of Civil Procedure. Originally it averred "that no other action or proceeding at law or in equity has been brought to foreclose the said plaintiff's said lien or claim." At the opening of the trial, however, the court permitted an amendment to add the words, "or to recover the amount due to the plaintiff." This amendment complied with the Code requirement (Bachmann v. Spinghel, 164 App. Div. 725, 149 N. Y. Supp. 610), and, having been granted without objection, leaves nothing to review.

We pass to consider the appellants' objections to the different liens.

[4] *As to the Notices of Lien.* Appellants attack the liens of William J. Sullivan, Lawrence Brothers, Incorporated, Gates & Company, Incorporated, and the Wright-Ogden Company, Incorporated, because the notices did not name the Empire City Racing Association as owner. In most cases the notices gave the name of the Empire City *Trotting Club,* which was this organization's former corporate title, before it was changed on January 18, 1908. Considering that the Empire City Trotting Club was the former name of this appellant, still retained in the record title of part of these lands, we think this misnomer did

not mislead the appellants, or any one interested. Lien Law, article 2, § 9, subd. 7, declares that such a misdescription shall not affect the validity of the lien. Here the true owner was named, under its former corporate title. The indexing of the lien was such as readily to discover and make certain its existence. Hence there was a substantial compliance with the statute. Ray on Mechanics Liens, § 163.

The Yonkers Lumber Company and the Lawrence Bros., Incorporated, both name in their notices of lien, as owner, James Butler, who at the time was the president and chief stockholder of the Empire City Racing Association. Here was an attempt to reach the Empire City Racing Association by designating the person whose activity gave rise to the belief in his ownership. Counsel also urges that even as a stockholder Mr. Butler's interest was reached. The case of Strauchen v. Pace, 195 N. Y. 167, 88 N. E. 51, cited by appellants, deals with priorities between competing lienors, and does not apply here, where no intervening interest is affected.

[5] *Not Stating the Consent or Request of the Owner.* This point is made against the liens of the Mt. Vernon Builders' Supply Company, Jacob Norden, and Kapp & Nordholm Company. But the consenting or requesting person need not be specified in such notice. It is enough to name the owner.

[6] *Signing and Verification of the Notices of Lien.* The verification in cases of workmen was by the attorney in the set form of such a verification of a pleading. To reject it would practically deny the right of an agent to verify in part on information and belief. The affiant avers that "the statements * * * are true to his own knowledge, except as to the matters therein stated to be alleged upon information and belief," which should suffice. McDonald v. Mayor, etc., of New York, 170 N. Y. 409, 63 N. E. 437.

[7] *As to Alleged Dissent of the Owner.* The lien of William J. Sullivan ($1,121.46) for gravel, crushed stone, and sand, also for cleaning, carting, and hauling material for driveways and track, is claimed by appellant to have been incurred against the owner's express dissent. With reference to the roadways, the owner wrote: "We shall require full details before giving our sanction to the same." The proofs do not bear out the contention that there was no consent. These expenses, not being disapproved, and having been expressly brought to the owner's attention, must now be regarded as having come within the terms of the subsequent bond, and therefore included in the resulting consent, and so ratified by the owner.

[8, 9] *As to the Notices Not Discriminating between Labor and Materials.* The lien of Sullivan, thus objected to, reads:

"The labor performed was carting, hauling, sprinkling, watering, and repairing, and cleaning up generally, the driveways and track on the premises hereinafter described. The labor to be performed is none. The material furnished was gravel, crushed stone, and sand. The material to be furnished is none. The agreed price and value of said labor and material is $1,211.46."

A notice of lien which did not separate labor and materials "furnished and to be furnished" was defective (Bossert v. Fox, 89 App. Div. 7, 85 N. Y. Supp. 308); but the notice may combine both labor

and materials in one item. See Felgenhauer v. Haas, 123 App. Div. 75, 108 N. Y. Supp. 476; Martin v. Gavigan Co., 107 App. Div. 279, 95 N. Y. Supp. 14; Woolf v. Schaefer, 103 App. Div. 567, 93 N. Y. Supp. 184. This objection, therefore, is bad.

*The Wages Liens.* The decision includes 79 labor liens, which were allowed. The men were carpenters and other manual workers, of whom 34 were paid by checks (afterwards dishonored) of the National Fair & Exposition Association. All but 7 got back these checks and tendered them at the trial. A claim in bankruptcy proceedings had been filed on behalf of all the wages claims. The mechanics' lien suit at bar was begun October 22, 1913. These labor lienors were allowed to intervene by order of February 6, 1914. The grounds already considered show a consent to these labor liens. Appellant, however, first urges that the labor liens of David Linton, $105.18, Edward Delapp, for $73.68, and Pierce A. Wall, $41.31, were not legally proven, because the lienors did not personally testify before the commissioner, but instead presented affidavits. It appeared that Justice Keogh suggested this in open court, as to Delapp and Wall, and their affidavits were thereafter received without objection. The lien of David Linton was established by his brother's testimony, who proved the services and the working time of both Lintons.

[10] *As to the Effect of Proving Claims in Bankruptcy Proceedings and the Resulting Composition Proceedings.* The National Fair & Exposition Association was adjudged bankrupt in the United States District Court on August 29, 1913. Many of the above lienors filed their claims in bankruptcy there, and others filed such claims with the referee. Mr. Gue was appointed trustee September 30, 1913. On April 16, 1914, the referee issued his certificate in composition, which composition was confirmed by the order of District Judge Mayer on May 6, 1914. By the terms of this composition class B creditors, which are made up of wage-earners, priority creditors, and mechanic's lien creditors, were to receive 8 per cent. cumulative preferred "stock" of the National Fair & Exposition Association, Incorporated, to the full amount of each claim. By a supplemental answer, the Empire City Racing Association set up this composition. The liens here adjudged are not against the bankrupt's property, but are enforced against that of the owner and lessor. The action of the lienors in voting in bankruptcy creditors' meeting should not be held to waive their claim against the owner. Matter of Thompson (D. C.) 208 Fed. 207, 31 Am. Bankr. Rep. 236, holds that "security" under the Bankrupt Act (Act Cong. July 1, 1898, c. 541, 30 Stat. 544) is limited to security out of or against the bankrupt's estate, and not as respects a collateral claim against other parties. In re Matthews (D. C.) 132 Fed. 274.

The respondents Norden, Mt. Vernon Builders' Supply Company, and Kapp & Nordholm Company withdrew from the bankruptcy proceedings after the first meeting of creditors. It has been stipulated that Gates & Co., Wright-Ogden Company, William J. Sullivan, Jandous Electric Equipment Company, Colwell Lead Company, and Percy Bloom filed no claims in bankruptcy against this lessee, and never participated in the proceedings in bankruptcy. Aside from the fact of

filing these claims of laborers and their failure to dissent, there does not seem to be proof of the acceptance of this composition by these lienors.

[11, 12] The decree by the Special Term distinguished the lien claims of the Jandous Electric Equipment Company (not allowed against the lessor, but allowed only against the interest of the lessee, the National Fair & Exposition Association and the trustee in bankruptcy). This lien was filed on September 8, 1913, after the adjudication in bankruptcy. It is objected that such notice of lien, so filed after the bankruptcy, was ineffective. The trustee in bankruptcy took title subject to all such liens, and to proceedings pending to enforce them. Schoenherr v. Van Meter, 215 N. Y. 548, 109 N. E. 625; Metcalf v. Barker, 187 U. S. 165, 23 Sup. Ct. 67, 47 L. Ed. 122. It does not appear that the "preferred 8 per cent." composition "stock" was ever issued to or accepted by the labor lienors. The small amounts of their claims seem to forbid such a supposition. Indeed, no provision in the decree for subrogation to such rights to "stock" is asked for.

[13] A point is raised as to the outstanding checks given to some of these work people. Naturally they cashed them, doubtless being already in debt for their family supplies. About 34 such instances appear, where the laborers got part cash on these worthless checks, which advances, at the time of the hearing, had not all been refunded. The checks, having come back again into the hands of the men, were tendered at the hearing in all but 7 instances. As to these 7 claims by laborers, the appellants, if they so require, will be entitled to have appended at the foot of the decree a provision for the production and deposit of such pay checks, which are outstanding and were not tendered at the trial.

The conclusion follows that the judgment should be affirmed, with a bill of costs to each of the seven attorneys who have appeared for respondents on this appeal, such costs to be taxed one-half against each appellant.

THOMAS, CARR, and STAPLETON, JJ., concur.

RICH, J. I dissent. The tenant, on July 9, 1913, wrote the owner, stating in detail the improvements it desired to make, and asking the owner's consent. To this letter the owner replied on the same day:

"In reply to your communication of even date, giving details of changes and additions you desire to make to the buildings and grounds at Empire City Park and requesting our consent thereto, we beg to say that under the provisions of the lease between us for the use of said park, dated December 28, 1912, all such changes and additions are to be made and erected at your expense, and the undersigned is to be held harmless therefrom. Subject to your furnishing us with a satisfactory guaranty of your ability to pay for such changes and additions, and provided the work is completed before August 31, 1913, we will accord you the following consents under the terms of said lease, to take effect when such guarantee is furnished."

Then follows a detailed statement of the proposed improvements consented to and those for which consents were refused.

Prior to the time when these letters were written, the tenant had entered into some contracts for materials and had employed some men

who had begun to work on the proposed improvements. Upon receipt of the reply to the letter of July 9th, a conversation regarding the guarantee was had between tenant's president and the secretary of the owner, Mr. MacKain, which the latter has detailed as follows:

"Mr. Stokes and Mr. Lea called up and asked what kind of a bond we wished, and we told them some guaranty company, and they asked which one, and I said the National Surety Company would be satisfactory. And Mr. Stokes and Mr. Lea said it would be impossible for them to give it that day, and I asked them how soon they could give one, and Mr. Stokes said that he was going back to the National Surety Company in a day or two, and he would get it down there, and everybody knew his position there, and he could get one very readily there. They asked if we would accept a personal bond. Mr. Stokes said that he owned some property valued at $100,000 in Nashville, Tenn., and was assessed for $50,000, or $60,000 free and clear, and Mr. Lea owned some property in Mississippi, and we could take their bond temporarily until he could get a National Surety bond."

On July 10, 1913, a bond executed by the tenant as principal, and Stokes and Lea as sureties, was mailed to the Empire City Racing Association, the receipt of which was acknowledged by the latter on July 11th as follows:

"We beg to acknowledge receipt of your temporary bond, and to say that, with the understanding that you will supplement it by July 22, 1913, with one issued by the National Surety Company of New York City for $20,000, the same is acceptable to us."

No surety company bond was given, and on August 29, 1913, the day the tenant was adjudged a bankrupt, the parties who later filed the liens involved in this action had furnished materials and labor in making the improvements under contracts with the tenant. No one of the contractors had seen the lease, or made any effort or inquiry to ascertain the conditions under which the lessee had possession, or whether such lessee had any authority or right to do any work upon said premises, with the exception of the plaintiff, whose vice president testified that he saw and read part of such lease, including its conditions as to repairs and alterations and the procurement of the consent of the lessor, and thereupon made up his mind, and so stated to the lessee, that he would "gamble" on being able to hold the owner of the property for the materials he was asked to sell to the lessee. He made no inquiry as to whether the consent had been given.

Appellants contend, among other things, that all of the liens are invalid, because the owner of the property against which they are filed did not request consent to the making of the improvements upon which the liens are based, and consequently no valid liens could be acquired upon its property under the provisions of section 3, article 2, of the Lien Law (chapter 33 of the Consolidated Laws). Under the provisions of the Lien Law, which provides that "a contractor, subcontractor, laborer or materialman, who performs labor or furnishes materials for the improvement of real property with the consent or at the request of the owner thereof, * * * shall have a lien for the principal and interest of the value, or the agreed price, of such labor or materials upon the real property improved or to be improved and upon such improvement, from the time of filing a notice of such lien as prescribed in this article" before the plaintiff could have a judg-

ment enforcing its lien by the sale of the property of the Empire City Racing Association, it was necessary to establish a request or consent of such association for the making of the improvements and alterations to its property.

This is conceded, but the plaintiff contends that it established this fact by the lease itself, the terms of which, it is argued, not only provide for alterations and improvements, but require that they be made to the extent of $20,000 within two years, and $50,000 within four years after its execution; and it is argued that this condition brings the case within the principle that, where a lease requires the tenant to make improvements or repairs, the requirement itself justifies the inference of the consent of the landlord owner sufficiently to sustain a lien. While it may be conceded that this is the well-established general rule, I think the facts in the case at bar remove it from the operation of that rule. The provisions of the lease fixing the time for making the improvements and alterations must be read in connection with the provisions requiring the lessor's written consent before any improvements or changes can be made. As so read, there is no obligation resting on the lessee to make any improvements which is created by the lease alone. Its agreement to make the improvements is conditioned upon the lessor's consenting, or directing changes and improvements. If the lessor refused to consent to the proposed improvements, and did not itself direct specified improvements, no obligation rested upon the lessee to make them. The clause requiring the consent of the lessor was undoubtedly to protect it from liability for labor or materials furnished in such work not consented to or directed by it, and to relieve it from compulsory liability for improvements of any kind, and unless such consent or direction was given the provisions of the lease protected it and its property from such liability.

I can find no words in the lease which can be construed as a consent or direction requiring improvements or alterations, except those connected with and part of the express requirement that the consent or approval of the lessor must be procured before proposed changes or improvements could be made by the lessee. Such provisions do not of themselves establish the consent (Mitchell v. Dunmore Realty Co., 126 App. Div. 829, 111 N. Y. Supp. 322), and it is a written consent, given after the lease became operative, that must be found to validate the liens upon the property of the lessor. Such a consent, the plaintiff contends, is established by the letters passing between the lessor and lessee. The improvements are specified in the letter of July 9, 1913, from the lessee to the lessor, and two letters from the lessor to the lessee, dated July 9th and 11th, respectively. It is clear that no consent had been given prior to the writing of the letter of July 9th. In its answer of July 9th the owner stated that it would consent to the making of the improvements designated therein, upon being furnished with a satisfactory guaranty. The language used:

"Subject to your furnishing us with a satisfactory guaranty, * * * we will accord you the following consents: * * * *To take effect when such guaranty is furnished"*

—repels any inference of an intention on the part of the lessor or understanding on the part of the lessee to give an absolute consent.

Following an oral inquiry as to the nature of the guaranty required and an assurance that the National Surety Company bond demanded would be given in the near future and as soon as it could be arranged for, and that in the meantime a temporary personal bond would be given, such a bond was sent to the lessor, who acknowledged its receipt in a letter stating:

"With the understanding that you will supplement it by July 22, 1913, with one issued by the National Surety Company of New York City for $20,000, the same is acceptable to us."

This acceptance was conditional, and never became operative as a consent, because the condition was never performed. In other words, the conditional consent impliedly arising from the acceptance of the temporary bond became operative only when the surety company bond was given. It never having been given, such conditional consent never became operative. The respondent further contends that an implied consent is evidenced by proof of knowledge by the owner that the proposed improvements were being made by the lessee. This contention rests upon testimony that on two or three different occasions the president of the lessor (and possibly one of its other officers) was seen by workmen driving or walking past the place where they were working. That testimony is insufficient to sustain the contentions. Lloyd v. Kilpatrick, 71 Misc. Rep. 19, 127 N. Y. Supp. 1096; Rice v. Culver, 172 N. Y. 60, 64 N. E. 761; De Klyn v. Gould, 165 N. Y. 282, 59 N. E. 95, 80 Am. St. Rep. 719; Garber v. Spivak, 65 Misc. Rep. 37, 119 N. Y. Supp. 269. In addition, the consent necessary to authorize the lessee to proceed with the proposed improvements was to be in writing, which made affirmative action on the part of the lessor necessary, and this requirement is not met or satisfied by proof of knowledge of some of the officers of the lessor that work was being done upon the property. The debts incurred in consequence of the alterations were those of the lessee, to whom credit was extended, and the creditors took the risk of nonpayment. The property of the lessor became liable for the payment of such debts only in the event that it took affirmative action in directing or consenting that the proposed improvements be made. The work proceeded without any request or direction having been made or consent given by the lessor; and it follows that its property was not liable for the liens which the plaintiff and the lien defendants attempted and assumed to impose upon it.

The plaintiff and the respondents relied solely upon the responsibility of the lessee in extending the credit, except that the plaintiff, with knowledge of the lease, preferred to "gamble" upon results rather than ascertain whether the consent had been given. Under the circumstances, I think the lienors must be held to have taken all the risk involved in extending credit to the lessee, and to be limited in their recovery to their debtor and its property. As was well said in a similar case, Hartley v. Murtha, 36 App. Div. 196, 56 N. Y. Supp. 686:

"The requirement that the plans and specifications should be submitted before any consent on the part of the landlord should become operative was not technical, but was substantial in its nature, and an important protection to her rights and interests. As it was utterly disregarded, it is plain that

the work proceeded without her consent, and that her property is in no way liable for the lien which the plaintiff has attempted to impose upon it."

The plaintiff ought not to be heard to complain of this result. I must vote to reverse the judgment, with costs to each of the appellants, and I think that the complaint ought to be dismissed upon the merits as to the defendant Empire City Racing Association, and dismissed as to the other defendants without prejudice to the bringing of an action against its debtor, the National Fair & Exposition Association, if the plaintiff shall be so advised.